Jeffrey Brownson
Idaho State Bar No. 7474
LAW OFFICE OF JEFFREY BROWNSON
223 North 6th Street, Suite 215
Boise, Idaho 83702
(208) 342-5800
(208) 437-8041 (fax)
jb@jeffreybrownsonlaw.com

Attorney for the Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>vs.<br><br>ENRICO MICHAEL PONZO, a/k/a "Jay Shaw",<br><br>              Defendant. | CASE NO. CR-12-0035-S-EJL<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT ENRICO M. PONZO'S MOTION TO SUPPRESS AND FOR EVIDENTIARY HEARING UNDER** ***FRANKS V. DELAWARE*** |

## I.  STATEMENT OF RELEVANT FACTS

The land located at 6107 Hogg Road, Marsing, Idaho is twelve acres of fenced-in property in a rural area.  There is a residence, detached garage, and pasture for grazing livestock.  The property is accessed through a closed gate from Hogg Road where a "No Trespassing" sign was posted nearby on the fence.  The mailbox for the property is located on Hogg Road outside the fencing.  Once through the main gate, in order to reach the residence one must travel up a private driveway approximately a quarter-mile in length to a second locked gate.  The second

1 • MEMORANDUM IN SUPPORT OF DEFENDANT ENRICO M. PONZO'S MOTION TO SUPPRESS AND FOR EVIDENTIARY HEARING UNDER *FRANKS V. DELAWARE*

gate is part of an inner fence that contained an electric wire and surrounds the residence and detached garage, separating it from the pasture acreage. The residence and detached garage are approximately 40 yards beyond this second closed gate.

In January 2011, based upon a tip, federal law enforcement agents began investigating whether Enrico M. Ponzo, who was wanted on a fugitive warrant, was living at 6107 Hogg Road under the assumed name Jay Shaw or Jeffrey John Shaw. Federal agents on February 7, 2011, observed Mr. Ponzo leave his residence at 6107 Hogg Road driving a blue Saturn. Shortly thereafter agents arrested Mr. Ponzo approximately one mile away without incident. Prior to arrest, Mr. Ponzo was standing outside his car speaking with a neighbor about purchasing hay for his cattle.

Through their investigation, federal agents knew Mr. Ponzo's two children were living in Utah with their mother. Mr. Ponzo confirmed this fact at the time of his arrest. Coincidently, while being detained that afternoon, the neighborhood children were being dropped off very close by following school that day – Mr. Ponzo's children were not on the school bus. Nonetheless, claiming they were confirming Mr. Ponzo's children were not left unattended, federal agents went to Mr. Ponzo's property, passed through both gates, and peered through the windows of the residence. While snooping around and looking through the windows, federal agents maintain they saw a "rifle" leaning against a wall inside. Photographs demonstrate that on this day, the curtains to the window agents claimed to see through were closed.

Federal agents also spoke with Mr. Ponzo's neighbors, one of whom conveyed that he had gone to a shooting range with Mr. Ponzo approximately four months prior and Mr. Ponzo brought an AR-15 rifle. Based on this information, on February 8, 2011, Special Agent Douglas

2 • MEMORANDUM IN SUPPORT OF DEFENDANT ENRICO M. PONZO'S MOTION TO SUPPRESS AND FOR EVIDENTIARY HEARING UNDER *FRANKS V. DELAWARE*

Hart sought and obtained a federal search warrant for Mr. Ponzo's residence and outbuildings located at 6107 Hogg Road, Marsing, Idaho. The search warrant was executed at the unoccupied residence that same day – February 8, 2011. According to the reports, FBI evidence technicians recorded a "pre" and "post" search video of the residence. On October 15, 2014, through counsel, Mr. Ponzo specifically requested the government produce these "pre" and "post" search warrant videos from February 8, 2011. Counsel for the government responded on January 22, 2015, advising the videos could not be found.

On March 24, 2011, law enforcement obtained a second warrant to seize and subsequently search the computers that agents saw in Mr. Ponzo's home during execution of the February 8, 2011 warrant. Meanwhile, Mr. Ponzo leased portions of his residence to Kelly Verceles.[1] The lease agreement spelled out that Mr. Verceles did not have authority to occupy Mr. Ponzo's master bedroom and office. On March 28, 2011, agents executed this second search warrant. While searching Mr. Ponzo's residence, agents discovered that someone had removed the contents of the master bedroom walk-in closet, tore out the carpet and uncovered a floor safe that had been encased there. During this same search, agents located the written lease agreement between Mr. Verceles and Mr. Ponzo.

Agents contacted Mr. Verceles and had him meet them at Mr. Ponzo's home. At least three armed federal agents questioned Mr. Verceles regarding his communications with Mr. Ponzo and the contents of the floor safe. Mr. Verceles was reluctant, but the agents pressed on that if he did not cooperate they would arrest him on felonies. Eventually, Mr. Verceles

---

[1]  Unfortunately, Mr. Verceles is now deceased due to suicide.

3 • MEMORANDUM IN SUPPORT OF DEFENDANT ENRICO M. PONZO'S MOTION TO SUPPRESS AND FOR EVIDENTIARY HEARING UNDER *FRANKS V. DELAWARE*

retrieved the items he obtained from the floor safe and provided it to law enforcement.  The items included various identifications, gold coins and U.S. currency.

## II.  ARGUMENT

Enrico M. Ponzo requests the suppression of all evidence obtained as a result of the unconstitutional searches and seizures occurring on February 7, 2011, February 8, 2011, and March 28, 2011.  The constitutional violations in this case are numerous and multifaceted.

### A)  The February 8, 2011 Search Warrant Lacked Probable Cause

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation . . ."  U.S. Cons. Amend. IV; *see also United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001); *United States v. Reeves*, 210 F.3d 1041, 1046 (9th Cir. 2000). The central requirement of probable cause is imperative "to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime" but still "give fair leeway for enforcing the law in the community's protection."  *Brinegar v. United States*, 338 U.S. 160, 176 (1945).

In determining whether a search warrant affidavit establishes probable cause, the Court must exclude from consideration any illegally obtained information.  *Bishop*, 264 F.3d at 924. The Court must also exclude any statements found to be intentionally or recklessly false as well as consider any misleading omissions.  *Franks v. Delaware*, 438 U.S. 154 (1978); *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).  If the court determines the search warrant affidavit included illegally obtained information, false statements or misleading omissions, the court must purge the affidavit of the offending facts and examine whether the remaining facts provide probable cause for the search warrant.  *Id.*  As explained below, the search warrant in

this case was issued based upon evidence unlawfully obtained as well as false statements and misleading omissions.  Without this information, the affidavit lacks probable cause for issuance of the search warrant.

### 1) Agent Hart's Search Warrant Affidavit Contained Illegally Obtained Information

#### A.  Officer's Warrantless Entry Upon Mr. Ponzo's Curtilage Was Unlawful

Law enforcement unlawfully entered Mr. Ponzo's property at the time they claimed to observe items utilized to obtain the search warrant, specifically a "rifle"[2] and a security camera. At the core of the Fourth Amendment's protection against unreasonable searches and seizures, is "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 133 S.Ct. 1409, 1414 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).  "The Fourth Amendment protection against warrantless searches extends to the curtilage around one's home." *United States v. Johnson*, 256 F.3d 895, 901 (9th Cir. 2001).  "The extent of the curtilage is determined by whether the individual may reasonably expect that the area in question should be treated as the home itself." *United States v. Furrow*, 229 F.3d 805, 816-17 (9th Cir. 2000).  To make this determination, the Supreme Court has established four factors: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included in an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *United States v. Dunn*, 480 U.S. 294, 300 (1987).

---

[2]  The alleged "rifle" was actually an air rifle/pellet gun, which is not a firearm under federal law, therefore irrelevant to probable cause.  A "firearm" is "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device."  18 U.S.C. § 921(a)(3).

In looking to these factors, law enforcement infringed upon Mr. Ponzo's curtilage from the moment they entered the first gate to his property. But clearly by the time they approached his front porch, agents were within Mr. Ponzo's constitutionally protected area.

First, Mr. Ponzo's enclosed area is in relatively close proximity to his house. While there is not any fixed distance at which curtilage ends, "the curtilage of a home in a rural area could extend farther than the curtilage of a home in an urban or suburban setting." *Johnson*, 256 F.3d at 902.

> Calling a fenced-in area around a rural home an 'open field' does not make it so. It is still a yard, even if somewhat larger than yards in urban areas. The realities of rural country life dictate that distances between outbuildings will be greater than on urban or suburban properties and yet still encompass activities intimately associated with the home; this is the nature of the 'farmstead.'

*Id.* Mr. Ponzo's home is in a rural area. As such, his yard is much larger than what one may expect to see in a city. The entire enclosed area is part and parcel to Mr. Ponzo's home.

Second, we look to whether the curtilage is enclosed. "For most homes, the boundaries of the curtilage will be clearly marked; and the conception defining curtilage – as the area around the home to which the activity of home life extends – is a familiar one easily understood from our daily experience. *Johnson*, 156 F.3d at 902 (quoting *Dunn*, 480 U.S. at 302). Fencing configurations are important factors in determining curtilage. *Id.* Mr. Ponzo's property consisted of 12-acres of fenced-in pasture. Within the property there is a residence and a 3-car garage that is further enclosed with a locked fence around the yard surrounding the house. *See* Declaration of Enrico M. Ponzo, ¶ 4. Mr. Ponzo's curtilage is enclosed and thus readily identifiable with boundaries created by a fence.

Third, the "use" factor also favors Mr. Ponzo's position.  A person's use of an area for intimate activities of the home lends itself towards that area being curtilage.  *Dunn*, 480 U.S. at 302.  Mr. Ponzo's property was equipped with machinery and instruments necessary to raise cattle, including irrigation lines.  *See* Declaration of Enrico M. Ponzo, ¶ 5.  Further, Mr. Ponzo kept a garden next to the dwelling in which he grew vegetables such as tomatoes and peppers for personal consumption.  *See* Declaration of Enrico M. Ponzo, ¶ 6.  In other words, the area in question was part of his personal space.

Finally, Mr. Ponzo took great steps to protect the area from entry by people passing by. Not only was there a large fence that surrounded the property at the end of the driveway, but there was an inner fence enclosing the dwelling.  *See* Declaration of Enrico M. Ponzo, ¶ 4.  The inner fence had an electric wire, and both fences were always kept securely locked.  *Id*.  Mr. Ponzo posted a "No Trespassing" sign near the main gate, which leads into the property from the main road.  *Id*.  The mailbox is on Hogg Road and the electricity meter is read remotely.  *Id*.  Mr. Ponzo had a security camera viewing his curtilage and a trained guard dog within the locked area.  *See* Declaration of Enrico M. Ponzo, ¶ 7.  Clearly he took many steps to protect and block passerby from entering this area.

As such, Mr. Ponzo's curtilage extends to his fenced-in areas surrounding his home.  Law enforcement made some observations from as close to his house as the porch.  There is no doubt the porch is a constitutionally protected area – "the front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'"  *Jardines*, 133 S.Ct. at

1415.  Any information law enforcement gathered from entering upon Mr. Ponzo's curtilage must be suppressed and purged from the search warrant affidavit.[3]

## B.  Exigent Circumstances Doctrine Does Not Apply

Law enforcement claims to have entered Mr. Ponzo's curtilage out of an "abundance of caution" to ensure his children were not in the home.  *See* Exhibit A, ¶ 12 to Declaration of Jeffrey Brownson.  "A warrantless search will normally be invalid unless there are 'exigent circumstances' that justify proceeding without a warrant."  *United States v. Brooks*, 367 F.3d 1128, 1133 (9th Cir. 2004).  Exigent circumstances are "those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."  *Brooks*, 367 F.3d at 1135 (quoting *United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir.1984) (en banc)).

Law enforcement claims to have entered Mr. Ponzo's curtilage out of concern over his children being left alone in the home.  This concern is a stretch at best.  Upon arrest, Mr. Ponzo informed officers his children were not at the house.  *See* Exhibit A, ¶ 11 to Declaration of Jeffrey Brownson and Declaration of Enrico M. Ponzo, ¶ 10.  Further, agents were watching Mr. Ponzo's house immediately prior to his arrest and would not have observed any children inside. *See* Exhibit A, ¶ 10 to Declaration of Jeffrey Brownson.  Additionally, as Mr. Ponzo was being arrested, the school bus that transports the neighborhood children home from school stopped to drop-off the children at the same location where Mr. Ponzo was arrested and within sight of the

---

[3]  As further discussed in Subsection 2, even if the Court finds law enforcement was properly on Mr. Ponzo's porch, officers could not see through the window to view the air rifle as claimed due to the curtains being closed.

agents.  His children were not on the bus.  *See* Declaration of Enrico M. Ponzo, ¶ 11.

Most compelling is a report FBI Agents Greg Knapp and Greg Rogers prepared during the course of investigation into Mr. Ponzo dated January 31, 2010, a week prior to his arrest. Specifically, the report states that "[Ms. Pace] left PONZO *with their two children* in December of 2010 and moved to Utah where she resides with her parents."  *See* Exhibit B to Declaration of Jeffrey Brownson (emphasis added).  This information is imputed upon all officers, particularly SA Hart, who was leading the investigation, as well as the agents who arrested Mr. Ponzo, pursuant to the collective knowledge doctrine.  *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007).  The collective knowledge doctrine "allows courts to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest."  *United States v. Villasenor*, 608 F.3d 467 (9th Cir. 2010).  The doctrine applies when law enforcement agents are working together in an investigation but have not necessarily explicitly communicated the facts each has independently learned.  *Id.*  TFO Knapp and SA Rogers were working the investigation into Mr. Ponzo with SA Hart and the arresting agents.  These were not independent branches that happen to be investigating the same person; rather this was a collective effort among these agents.

As such, the exigent circumstances doctrine does not apply in this case.  All facts led the agents to believe that Mr. Ponzo's children were not at his house.  Stating any concern to the contrary is disingenuous.  Therefore, all evidence obtained when law enforcement unlawfully entered upon Mr. Ponzo's constitutionally protected curtilage must be suppressed.

C. Emergency Doctrine Does Not Apply

Somewhat distinct from exigency is the "emergency doctrine," which is derived from

police officers' community caretaking function.  *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir. 2000).  The Supreme Court has consistently held that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403-04 (2006).

However, in order to do so law enforcement must have an *objectively reasonable basis* for concluding that there is an immediate need to protect others or themselves from serious harm."  *United States v. Snipe*, 515 F.3d 947, 951-52 (9th Cir. 2008) (emphasis added).  "The "'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises."  *Dagdagan v. City of Vallejo*, 682 F. Supp. 2d 1100, 1109 (E.D. Cal. 2010).

Akin to the analysis above regarding exigency, there are simply no objective facts supporting the conclusion that Mr. Ponzo's children were home at the time of his arrest, let alone needing protection from imminent injury.  The totality of the circumstances instead shows that the agent's warrantless entry onto Mr. Ponzo's property was based on speculation.  With mere supposition at best, agents were required to "take additional steps to determine whether there [i]s an emergency that justifie[s] entry in the first place."  *Hopkins v. Bonvicino*, 573 F.3d 752, 765 (9th Cir. 2009) (citing *United States v. Russell*, 436 F.3d 1086, 1092 (9th Cir. 2006)).  Here, the agents did not take any additional steps.

### 2) The Search Affidavit Contained Recklessly Misleading Statements

Agents presented recklessly misleading statements in the affidavit offered in support of the application for a search warrant for Mr. Ponzo's property.  A defendant has the right to

challenge a warrant's supporting affidavit where it contains misrepresentations of fact relevant to the probable cause determination. *Franks*, 438 U.S. at 155-56. "Because it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon this authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." *Id.* at 165; *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985). "By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw." *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985). To allow judges to "be mislead in such a manner could denude the probable cause requirement of all real meaning." *Id.*

A defendant may challenge a facially valid affidavit by making a substantial showing that: (1) the affidavit contains intentionally or recklessly false statements or misleading omissions; and (2) the affidavit purged of its falsities would not be sufficient to support a finding of probable cause. *Id.* at 780. The defendant need only "make specific allegations that indicate the portions of the warrant claimed to be false." *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1982). A *Franks* hearing, as it is known, does not require clear proof, but rather only a substantial preliminary showing. *Stanert*, 762 F.2d at 781. To ensure the independent and neutral Magistrate's function was properly and adequately performed, reviewing courts must "conscientiously review the sufficiency of the affidavits on which warrants are issued." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). If, after excising the false statements from the warrant, the Court determines probable cause is lacking then suppression is the proper remedy. *Franks*, 438 U.S. at 171-72.

In this case, SA Hart, collectively with his investigation team, presented an affidavit

containing recklessly false statements and misleading omissions.  First, SA Hart claimed agents

went to Mr. Ponzo's home after arresting him out of concern "as to whether or not children

would be left behind at the residence while Ponzo was being transported to be fingerprinted."

*See* Exhibit A, ¶ 12 to Declaration of Jeffrey Brownson.  However, TFO Knapp and SA Rogers,

both working on the Ponzo investigation with SA Hart, knew as of January 31, 2011 that Mr.

Ponzo's wife, Cara Pace, left with their two children in December 2010 and moved to Utah

where she resides with her parents.  *See* Exhibit B to Declaration of Jeffrey Brownson.  Further,

Mr. Ponzo told the agents his children were in Utah with Ms. Pace.  *See* Exhibit A, ¶ 11 to

Declaration of Jeffrey Brownson and Declaration of Enrico M. Ponzo, ¶ 10.  Additionally,

agents had been surveying Mr. Ponzo's house during the hours preceding his arrest and did not

observe any children in the house.  *See* Exhibit A, ¶ 10 to Declaration of Jeffrey Brownson.

Finally, all of the neighborhood children were dropped off by the school bus within sight of the

agents and Mr. Ponzo's children were not on the school bus.  *See* Declaration of Enrico M.

Ponzo, ¶ 11.  Agents were well aware that the children were not in the home at the time of arrest.

Nevertheless, they claimed to enter the curtilage of Mr. Ponzo's residence under the ruse of

verifying whether the children were home.  *See* Exhibit A, ¶ 12 to Declaration of Jeffrey

Brownson.  Law enforcement purposefully, or at a minimum recklessly, omitted the fact that

they had ample evidence indicating the children were not at Mr. Ponzo's home.

Second, when agents entered Mr. Ponzo's property after arresting him on February 7,

2011, TFO Douglas Gately claimed to see a "rifle"[4] through a window.  *See* Exhibit A, ¶ 12 to

---

[4]   Note that a "rifle" could be any sort of rifle, i.e. an air rifle/pellet gun or a paint-gun, but not necessarily a
"firearm" as defined in 18 U.S.C. § 921(a)(3).  Nevertheless, SA Hart used this information to further speculate that
Mr. Ponzo possessed "multiple firearms."  *See* Exhibit A, ¶ 18 to Declaration of Jeffrey Brownson.

Declaration of Jeffrey Brownson.  This is simply not possible as the curtain was closed to the French-door window through which law enforcement claimed to have "clearly" viewed the rifle.  *See* Exhibit C to Declaration of Jeffrey Brownson.  SA Hart took the photograph in Exhibit C on February 8, 2011, prior to entering the home with the search warrant.  Exhibit C illustrates the curtain is closed.  Compare this to Exhibit D, which is a picture SA Hart took after officers entered the home in order to execute the search warrant.  Interestingly, the curtain is now open just moments later.[5]  Just like when the officers approached the house on February 8, 2011, the curtain was likewise closed the day prior when agents went to Mr. Ponzo's home and viewed a "rifle."  Agents could not clearly see a rifle through a window – the only way they could have seen this was by unlawfully entering Mr. Ponzo's home after arresting him blocks away.

 Third, the "rifle" law enforcement claims to have seen through the window, was unmistakably an air rifle.  FBI Agents have a great deal of training in firearms and could presumably tell the difference between a rifle or firearm and an air rifle.  Moreover, right next to the air rifle in plain view was a labeled canister of pellets.  Nevertheless, in the affidavit in support of the application for the search warrant, SA Hart states that agents observed what was clearly a firearm inside the house.  *See* Exhibit A to Declaration of Jeffrey Brownson.

 Fourth, SA Hart's search warrant affidavit states:

>  I believe documentation regarding Ponzo's source of income for the past several years would also exist within the residence.  Ponzo has alleged ties to the Mafia in Massachusetts, and has been charged with a number of serious crimes in that state.  For the first five years of my career, I was assigned to an Organized Crime Squad, and am familiar with how organized crime enterprises operate.  A person cannot maintain a multi-acre property and residence without a source of

---

[5]  As argued in the contemporaneously filed Defendant's Motion to Dismiss, the closed curtain would be more clearly evidenced by the pre search video taken contemporaneously with the search warrant execution.  However such video has been destroyed.

> income.  I believe Ponzo may have been receiving financial support from
> organized crime associates, and evidence of this may exist within the residence.

*See* Exhibit A, ¶ 19.B to Declaration of Jeffrey Brownson.  In so asserting, SA Hart did not

reveal to the magistrate that there were absolutely no allegations or evidence of Ponzo having

ongoing "alleged ties to the Mafia" for well over a decade.  Further, agents interviewed Mr.

Ponzo's neighbors, *See* Exhibit A, ¶ 14 to Declaration of Jeffrey Brownson, and while they claim

Ponzo did not work, they failed to report to the magistrate – but surely knew from their

investigation in talking to neighbors, Cooperating Witnesses, and viewing the property  – that: 1)

the 6107 Hogg Road was a 12-acre working cattle ranch, tended to by Ponzo; 2) his wife, Cara

Pace, who's father they spoke to before obtaining the warrant, was gainfully employed prior to

leaving; and 3) that Mr. Ponzo stayed home with the children prior to them moving to Utah.  *See*

Declaration of Enrico M. Ponzo, ¶ 12.

Fifth, SA Hart's search warrant affidavit states that agents spoke to a neighbor, William

Clapier, who said he had gone target shooting with Mr. Ponzo approximately four (4) months

earlier and that Mr. Ponzo brought along an AR-15 rifle.  *See* Exhibit A, ¶ 15 to Declaration of

Jeffrey Brownson.  SA Hart then goes on to suggest in the affidavit that he believes "Ponzo

possesses multiple firearms."  *See* Exhibit A, ¶ 18 to Declaration of Jeffrey Brownson.  What SA

Hart failed to share was that SA Hart knew that numerous other neighbors were also interviewed

and *none* of them had ever seen Mr. Ponzo possess a firearm.  *See* Exhibit E to Declaration of

Jeffrey Brownson.  This constitutes a material omission from the affidavit presented to the

Magistrate.

Sixth, in his search warrant affidavit SA Hart states, "I have been unable to contact or

speak with [Cara] Pace [Mr. Ponzo's common-law wife]. *See* Exhibit A, ¶ 16 to Declaration of

Jeffrey Brownson. SA Hart's statement is not only misleading, it is deceptive and troubling. SA

Hart omitted from his affidavit that TFO Knapp, with whom SA Hart was working on this

investigation, *had* spoken to Ms. Pace the day prior. *See* Exhibit E to Declaration of Jeffrey

Brownson. SA Hart also elected to not inform the Magistrate that federal agents had Ms. Pace's

contact information and could reach her if necessary, and that when told that agents were

concerned there may be more firearms in the residence Ms. Pace failed to confirm their concern

and instead advised she had removed all of her personal firearms in December – suggesting that

there were no additional firearms left behind. *Id*.

The above statements were intentionally or at least recklessly misleading, many are

simply false, and other material information was blatantly and disingenuously omitted. As

discussed in the following section, absent the misleading information, as well as the unlawfully

obtained information, the affidavit offered in support of the search warrant lacks probable cause.

### 3. The Search Warrant Lacks Probable Cause after Omitting Information Unlawfully Obtained and the Misleading Statements

Purging the search warrant affidavit of the unlawfully obtained evidence and misleading

statements, leaves the search warrant unsupported by probable cause. The affidavit supporting

the warrant must provide sufficient facts to enable the magistrate to find probable cause. *Illinois*

*v. Gates*, 462 U.S. 213, 239 (1983). "Sufficient information must be presented to the magistrate

to allow that official to determine probable cause; his [or her] action cannot be a mere ratification

of the bare conclusions of others." *Id.* A valid warrant must demonstrate both probable cause of

criminal activity, and "a showing that evidence probably will be found at the locations searched."

*United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995); *see also United States v. Ramos*, 923 F.2d 1346, 1351 (9th Cir. 1991) overruled on other grounds by *United States v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001) ("Probable cause to justify a search warrant exists when there is a sufficient showing that incriminating items are located on the property to which entry is sought.").

After excluding the vast amount of information that must be purged from the affidavit, as argued above, the warrant is left with very little.  The "Factual Background" of the affidavit commences with an attempt to paint a certain picture of Mr. Ponzo, stating that Mr. Ponzo was indicted for various crimes, including RICO violations, in 1997 based upon his alleged involvement in the "Mafia."  The Ninth Circuit has cautioned that reliance upon an indictment; especially dated information as is the case here, is an insufficient basis for the conclusion that there is probable cause to search a home.  *United States v. Chesher*, 678 F.2d 1353, 1363 (9th Cir. 1982) ("the mere recitation in the affidavit that a RICO indictment had been issued gave the magistrate no basis for concluding that there was any evidence of current association").

There are just bare conclusions remaining.  For example, after SA Hart pieced together in the affidavit that Mr. Ponzo may be residing at 6107 Hogg Road, Marsing, Idaho, he concludes:

> I believe that documentation would exist within Ponzo's residence to indicate where and how he obtained the alias Jeffrey John Shaw and/or Jay Shaw, plus any others that he may have created and used in the past.  Other documentation might include a birth certificates [sic], social security cards, and the like.

*See* Exhibit E, ¶ 14 to Declaration of Jeffrey Brownson.  "Probable cause can[not] be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the underlying circumstances upon which that belief is based."  *United States v. Underwood*, 2011 WL 2415544 (2011) (quoting *United States*

16 • MEMORANDUM IN SUPPORT OF DEFENDANT ENRICO M. PONZO'S MOTION TO SUPPRESS AND FOR EVIDENTIARY HEARING UNDER *FRANKS V. DELAWARE*

*v. Ventresca*, 380 U.S. 102, 108-09 (1965); *see also Gates*, 462 U.S. at 239 ("An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and . . . wholly conclusory statement[s] . . . fail [] to meet this requirement.")

SA Hart also relies upon a conversation with a neighbor indicating he went target shooting with Mr. Ponzo in October 2010.  "An affidavit must be based on facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (internal citations omitted).  For example, in *Durham v. United States*, 403 F.2d 190 (9th Cir. 1968), the Court concluded that the warrant containing information from four months prior was stale.  The defendant in that case was charged with counterfeiting activities.  *Id.* at 194.  The information contained in the search warrant affidavit was from four months prior to the issuance of the warrant.  *Id.*  The Ninth Circuit concluded "[t]here was nothing in the affidavit from which the Commissioner could reasonably conclude that any of the activities described continued beyond the stated in the affidavit, much less for the more than four months that elapsed before the warrant was issued." *Id.* at 195.

Similarly, Mr. Ponzo's neighbor claimed he went target shooting with Mr. Ponzo over four months prior to the issuance of the search warrant.  A comment that Mr. Ponzo had a gun at a target range over four months prior, does not provide probable cause that Mr. Ponzo had firearms at his house on February 8, 2011.  *See United States v. Solorio*, 577 F.2d 554, 555-56 (9th Cir. 1978) ("That George Solario was also seen with a handgun between May 7 and May 16, 1977, is relevant to our inquiry.  But, assuming this information provides probable cause to search George personally, it does not provide the basis for an inference that the weapon would be

found at the Solario home, since there was no indication that it had been or would be kept there.")  The neighbor's comment is stale and lacks sufficient nexus to Mr. Ponzo's home.[6]  *See Durham v. United States*, 403 F.2d 190 (9th Cir. 1968) (information that paraphernalia existed in defendant's trailer four months prior to issuance of a warrant deemed stale).  Moreover, all of Mr. Ponzo's other neighbors said they had never seen Mr. Ponzo possess a firearm.

In conclusion, the portions of the search affidavit remaining after purging all the above-statements are very minimal and conclusory at best.  As such, the February 8, 2011 search warrant lacked probable cause and all evidence obtained as a result of the search must be suppressed.

### B. The February 8, 2011 Search Warrant Lacked Particularity

The Fourth Amendment requires that search warrants particularly describe the place to be searched and the items to be seized.  This "particularity requirement" is well-established in Supreme Court law. *See Stanford v. Texas*, 379 U.S. 476, 481-85 (1965).  The items to be seized must be described in the warrant itself — not just the application for the warrant.  "The fact that the application adequately described the 'things to be seized' does not save the warrant from its facial invalidity.  The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents."  *Groh v. Ramirez*, 540 U.S. 551, 557 (2004); *see also Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984) ("[A] warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional").

---

[6] If this court finds that officers could see the air rifle through Mr. Ponzo's window, and not through some other unlawful entry on February 7, 2011, then Mr. Clapier's statement must be suppressed as the fruit of the unlawful entry upon Mr. Ponzo's curtilage.  *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  If law enforcement had not unlawfully entered Mr. Ponzo's curtilage, then they would not have been in the position to view the air rifle and thus would not have questioned Mr. Ponzo's neighbors, including Mr. Clapier, regarding firearms.

In this case, the search warrant issued on February 8, 2011 simply incorporated "Attachment B" from SA Hart's application and affidavit.  *See* Exhibit I to Declaration of Jeffrey Brownson.  "Attachment B" is unequivocally overbroad and lacking particularity.  For example, "Attachment B" allows for the search and seizure of "[f]irearms and ammunition, receipts for firearms and ammunition, hunting licenses, and concealed weapon permits."  Assuming, for the sake of argument, that Mr. Clapier's claim that he observed Mr. Ponzo possess an AR-15 four months prior at a shooting range is not fruit of the unlawful entry into Mr. Ponzo's curtilage, and nor is it stale or lacking a sufficient nexus to Mr. Ponzo's residence, then Mr. Clapier's claim by itself does not give law enforcement reasonable grounds to believe any additional firearms would be in Mr. Ponzo's residence.  *See United States v. Nora*, 765 F.3d 1049, 1058-59 (9th Cir. 2014) ("Nora ran into the house with the gun in his hand but exited without it, giving the officers reason to believe it was still inside.  The gun was of course evidence of the crime for which the officers had probable cause to arrest him and would therefore have been subject to seizure on that basis alone.  But without more, the officers' firsthand observations of Nora with a gun in his hand did not give them reasonable grounds to believe that any additional firearms would be found in the house.)  *See also Millender v. Cnty. of Los Angeles,* 620 F.3d 1016, 1025 (9th Cir.2010) (en banc), *rev'd on other grounds sub nom. Messerschmidt v. Millender,* ⸺ U.S. ⸺ –, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012).

Similarly, "Attachment B" allows for the search and seizure of books, records, receipts, etc… of "alias identities."  The only alias identity the government had any evidence of was Jay Shaw.  SA Hart's affidavit contains no facts tying Mr. Ponzo to any other alias.  This lack of particularity is a fatal flaw in the February 8, 2011 search warrant.  "[P]robable cause to believe

that *some* incriminating evidence will be present at a particular place does not necessarily mean there is probable cause to believe that there will be more of the same." *United States v. Weber*, 923 F.2d 1338, 1344 (9th Cir. 1990) (emphasis in original).

Because the warrant lacks any sort of particularity in this case it must be found to be unconstitutional and the items seized as a result of its execution should be suppressed.

### C. Evidence Obtained from the March 28, 2011 Search of Must Be Suppressed

Law enforcement obtained a search warrant on March 24, 2011 to further search Mr. Ponzo's residence. This subsequent search took place on March 28, 2011. Evidence obtained during this search must be suppressed as: 1) the search warrant was the fruit of the poisonous tree in that it is a derivative of the February 8, 2011 search warrant; 2) law enforcement exceeded the scope of search warrant; 3) Mr. Verceles lacked authority to provide the contents of Mr. Ponzo's safe to law enforcement; and 4) Mr. Verceles consent was not voluntarily given.

### 1. All Evidence Obtained As a Result of the March 28, 2011 Search of Mr. Ponzo's Home Is the Fruit of the Poisonous Tree

The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search, but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341 (1939); *Weeks v. United States*, 232 U.S. 383 (1914). Exclusion "extends as well to the indirect as the direct products" of unconstitutional conduct. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). Law enforcement unlawfully searched Mr. Ponzo's home on February 8, 2011. During this search, agents discovered he had computers in his home. Based upon this discovery, agents sought and obtained a second warrant on March 24, 2011 to seize and search these computers. Because the second search warrant was based upon observations made during the February 8,

2014 unlawful search, it is a derivative of the illegality of that search and therefore must be suppressed.

### 2.  Law Enforcement Exceeded the Scope of the Warrant by Interrogating Mr. Verceles

"The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'"  *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  "A warrant search is unreasonable if it exceeds the scope or intensity of the warrant."  *United States v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991).  If the search exceeds the scope of the warrant, the search and any subsequent seizures are unconstitutional.  *Horton v. California*, 496 U.S. 128, 140 (1990).

The scope of the lawful search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found."  *United States v. Ross*, 456 U.S. 798, 824 (1982) ("Probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a briefcase."  The question of whether a search exceeds the scope of a search warrant is an issue courts determine through an objective assessment of the circumstances surrounding the search.  *United States v. Hitchcock*, 286 F.3d 1064, 1071 (9th Cir. 2002) (citing *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978).  "The subjective state of mind of the officer executing the warrant is not material to [the courts] inquiry."  *Id.*

The search warrant issued on March 24, 2011 authorized law enforcement to enter Mr. Ponzo's home to obtain computers.  While there, law enforcement entered Mr. Ponzo's bedroom

closet and discovered an empty safe built into the floor of his room.  The safe was previously unknown to law enforcement and thus not mentioned in the search warrant.  There was nothing in the warrant indicating that computers would be located in Mr. Ponzo's bedroom closet. Agents' entry into that portion of his house exceeded the scope of the warrant.

Further, the safe was empty and as such there was nothing about this safe that was incriminating.  Nonetheless, law enforcement contacted Mr. Verceles, who was not at the house at the time, and interrogated him regarding the contents of the safe.  They threatened that if he did not cooperate then he could be charged with a crime.  This interrogation was part and parcel to law enforcement's search of Mr. Ponzo's residence.  However, the nature and content of the interrogation was not in any way part of the warrant.  Rather, it very much exceeded the scope of the warrant.  Mr. Verceles finally gave in to agents' threats and coercion and provided law with the contents of Mr. Ponzo's safe.[7]  This interrogation transformed the agents, otherwise lawful entry into Mr. Ponzo's home, into a search for the contents of the safe.  In doing so, law enforcement's search exceeded the scope of the warrant.  All evidence obtained as a result of agents' interrogation of Mr. Verceles must be suppressed.

### 3.  Mr. Verceles Lacked Authority to Consent to the Search of the Safe

An individual may challenge a third party's consent to search an area or an item in which that individual has an expectation of privacy.  *United States v. Bagley*, 772 F.2d 482, 489 (9th

---

[7]  Some of the contents of the safe, including various documents, were contained in a closed opaque white plastic bag.  A warrant is necessary before police may open a closed container because by concealing the contents from plain view, the possessor creates a reasonable expectation of privacy.  *See United States v. Gust*, 405 F.3d 797, 800 (9th Cir. 2005) (holding that unless a container is such that its contents may be said to be in plain view, those contents are generally protected by the Fourth Amendment).  Therefore, even if the seizure of the opaque bag from Mr. Verceles is found to be lawful, the warrantless search of the bag requires the suppression of the bag's contents.

Cir. 1985) (Holding that the government cannot challenge a person's standing at the same time as claiming at trial that items belong to the defendant).  A consensual search is only reasonable when the consent-giver has actual authority over the area searched.  *United States v. Matlock*, 415 U.S. 164 (1974).  "'Common authority' rests on mutual use of the property by those generally having joint access or control so that it is reasonable to recognize that any of the parties has the right to permit inspections and others have assumed the risk that the third parties might consent to the search."  *United States v. Yarbrough*, 852 F.2d 1522 (9th Cir. 2000).  "The existence of consent to a search is not lightly to be inferred and the government always bears the burden of proof to establish the existence of effective consent."  *United States v. Reid*, 226 F.3d 1020, 1025 (9th Cir. 2000).  Mere access to a residence or property does not establish actual authority to consent to search.  *Id*

For example, in *United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003), the Court held that the defendant's friend did not have consent to provide law enforcement the disks he agreed to hold onto for safekeeping.  The defendant provided his friend with computer disks to hold onto while he was incarcerated in jail.  *Id.* at 611.  The defendant later wrote a note to the friend asking that he destroy the disks.  *Id.*  Law enforcement intercepted the note and went to the friend's house, without a warrant, to obtain the CDs.  *Id.*  The friend consented to giving the agents the CDs.  *Id.*  The defendant challenged the consent based upon the fact that the friend did not have authority to provide the agents with his CDs.  *Id.*  The court agreed and held that the friend "has no common authority either to look at the contents of the discs, or to allow anyone else to do so."  *Id.* at 614.  As such, the court found the agents violated the Fourth Amendment and suppressed the contents of the CDs.  *Id.* at 617.

23 • MEMORANDUM IN SUPPORT OF DEFENDANT ENRICO M. PONZO'S MOTION TO SUPPRESS AND FOR EVIDENTIARY HEARING UNDER *FRANKS V. DELAWARE*

Similarly, Mr. Verceles has no common authority of the contents of the safe.  Nor did he have authority to provide anyone else what was contained therein.  Mr. Ponzo had an expectation of privacy in everything contained is his safe.  He did not give up this expectation of privacy when incarcerated.  The lease with Mr. Verceles clearly spelled out that he had no authority over Mr. Ponzo's bedroom.  *See* Exhibit G to Declaration of Jeffrey Brownson  Therefore, Mr. Verceles lacked authority to provide agents the contents of Mr. Ponzo's safe.  As in *James*, this Court must suppress the evidence to this effect that agents obtained from Mr. Verceles.

### 4.  Mr. Verceles Encounter with Agents was Involuntary

Even if this Court finds Mr. Verceles had authority to consent to providing law enforcement the contents of Mr. Ponzo's safe, Mr. Verceles consent cannot be said to be voluntary.  The trial court must determine if consent was voluntarily given.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973).  In doing so, the court should "examin[e] all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as to the possibly vulnerable subjective state of the person who consents."  *Id.*  The government bears the burden of establishing voluntary consent, and this "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."  *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968).  An individual's voluntary compliance with a police demand is not consent.  *United States v. Bautista*, 362 F.3d 584, 591-92 (9th Cir. 2004).

The Ninth Circuit employs a five-part test to determine in voluntary consent has been given: (1) whether the person questioned was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the individual was

notified that he had a right not to consent; and (5) whether the individual had been told a search warrant could be obtained." *United States v. Washington*, 490 F.3d 765, 775 (9th Cir. 2007).

Mr. Verceles did not voluntarily consent to providing agents the contents of Mr. Ponzo's safe. He describes in telephone calls to Mr. Ponzo a situation full of duress. Agents called him to Mr. Ponzo's house to talk. Once there, Mr. Verceles was seized by approximately three armed agents and never informed of his *Miranda* warnings. Law enforcement threatened if he did not cooperate then he would be arrested on felonies. This situation cannot be said to be one of voluntariness. Because Mr. Verceles consent was not voluntary, everything resulting from it must be suppressed.

## III.  CONCLUSION

Based upon the foregoing, the Court should grant Mr. Ponzo's Motion to Suppress.

DATED this 21st day of August 2015.

/s/ Jeffrey Brownson

CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of August 2015, I filed the foregoing electronically through the CM/ECF system, which caused the parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Christian S. Nafzger
Assistant United States Attorney
Office of the United States Attorney
Washington Group Plaza, IV
800 East Park Blvd., Ste. 600
Boise, ID 83712
christian.nafzger@usdoj.gov

/s/ Jeffrey Brownson